E-FILED
Wednesday, 22 April, 2026  10:38:53 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| KATY KILGORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-04145-SLD-RLH |
| | ) | |
| ROCK ISLAND COUNTY FOREST | ) | |
| PRESERVE, d/b/a NIABI ZOO, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER</u>

Before the Court is a motion for summary judgment, ECF No. 27, from Defendant Rock

Island County Forest Preserve, doing business as Niabi Zoo ("the Zoo").  For the reasons that

follow, the Zoo's motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**[1]

The Zoo's season typically spans from March through October each year, so it fills many

of its roles with temporary seasonal employees.  These temporary seasonal positions are always

terminated at the end of the season and, if employees want to return for the following season,

they must reapply.  Hannah Stockton, the Zoo's office manager, interviewed, hired, trained, and

supervised Plaintiff Katy Kilgore in her role as a receptionist, a temporary seasonal position, at

the Zoo for the 2023 season.  Receptionist job duties include accurately answering phone

inquiries from guests, responding to voicemails and guest emails with correct information, and,

when their phone and correspondence tasks are minimal, filling food bags.

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  The facts related here are, unless otherwise noted, taken from the Zoo's statement of undisputed material facts, Mot. Summ. J. 3–9; Kilgore's response thereto and statement of additional material facts, Resp. 2–8, ECF No. 28; the Zoo's reply to Kilgore's additional material facts, Reply 1–2, ECF No. 29; and the exhibits to the motion.

Kilgore has paralysis on one side due to a stroke.  Her disability is visible—she walks with a cane and struggles with certain physical acts, such as standing or walking for over thirty minutes.  That Kilgore is physically disabled was apparent to Stockton when Kilgore arrived for her in-person interview.  When she filled out her employment paperwork, Kilgore said she would not need any accommodations.  However, while on a tour on her first day at work, Kilgore saw that the breakroom had one table and one set of chairs, both of which were taller than regular tables and chairs.  Kilgore can sit in some of these tall chairs and not others, so she realized she needed to test them.  When Kilgore attempted to sit in the chairs, she confirmed that because of her disability, she could not get as high as necessary to sit in the chairs.

Kilgore began eating her lunch on a bench in the hallway by the breakroom ("the bench").  The bench was directly across from bathrooms used by employees and the public and near the public entrance to an animal exhibit.  Fellow temporary seasonal employee Cara Chamberlain occasionally sat and ate lunch on the bench with Kilgore.  The Zoo director, Lee Jackson, saw Kilgore eating at the bench alone and directed her supervisor, Stockton, to tell Kilgore not to eat there because it did not look appropriate.  When Stockton conveyed Jackson's instructions to Kilgore, Kilgore told Stockton that the table and chairs in the breakroom were unusable because of her disability.  This conversation humiliated, upset, and embarrassed Kilgore, who already felt singled out by her inability to eat with everyone else.  Stockton offered to move a regular height chair into the breakroom for Kilgore to sit in, but Kilgore felt this was not a viable option because the table would still be tall.

The conservation classroom was also near the breakroom and the bench.  This classroom was reserved for birthday parties and other guest events, during which time employees were not allowed to use it.  Because the door was usually closed, no one besides managers and supervisors

ever went into the classroom.  During her deposition, Kilgore testified that the classroom would have been a suitable alternative had it been offered to her, but that it was never given as an option.  Kilgore Dep. 82:16–83:2, Mot. Summ. J. Ex. 1, ECF No. 27-1.  But during Stockton's deposition, she testified that she did offer the classroom as an option for Kilgore, Stockton Dep. 21:12–14, Mot. Summ. J. Ex. 6, ECF No. 27-6, and in response, Kilgore gave her a "look of disgust," *id.* 22:16–23:3 (describing the look as "raised eyebrows").  Based on that look, Stockton offered the final accommodation.  *Id.*

This final accommodation was for Kilgore to eat at assistant registrar Jan Williams's desk—but only while Williams was not working.  Williams's shift usually started at 12:00 p.m. and Kilgore's lunch break typically ran from 12:00 p.m. to 12:30 p.m.  Williams frequently arrived at work late, so Stockton believed that Kilgore's inability to eat at Williams's desk while Williams was present would not frequently interfere with Kilgore's lunch break.  Stockton Dep. 24:2–15.  Kilgore said she was not humiliated to eat at someone else's desk, Kilgore Dep. 84:2–3, but that she "[a]bsolutely" felt embarrassed and humiliated when Williams would arrive while Kilgore was still sitting and eating at the desk, *id.* 92:3–6, which would happen frequently, *id.* 86:10–20.  When this happened, Kilgore said she threw out her lunch and returned to work early.  Sometimes, especially in the beginning of the season, Kilgore returned to work early but did not clock back in until her entire thirty minute lunch break had elapsed.  Stockton never followed up with Kilgore to determine if eating at Williams's desk was satisfactory for Kilgore, and Kilgore never informed anyone at the Zoo that she could not take a full lunch break at Williams's desk.

Like all other temporary seasonal employees, Kilgore was terminated at the end of the 2023 season and encouraged to reapply for the 2024 season.  Kilgore anticipated being rehired; she never received any negative feedback, Kilgore Dep. 111:4–5, 112:18–21; always showed up

3

on time, *id.*; offered to help Stockton, *id.* 112:22–113:4; was told she did "awesome" at the end of the season by Stockton, *id.* 111:10–13; and believed that most temporary seasonal employees were rehired, *id.* 100:1–4. But when Kilgore reapplied for the 2024 season, she was not rehired, despite Stockton's preference for rehiring, Stockton Dep. 32:17–20.

Stockton informed Kilgore that the receptionists hired for the 2024 season were better qualified than Kilgore. Contrary to Kilgore's testimony of her performance at work, Stockton discussed finding typos and incorrect information in Kilgore's work, *id.* 40:2–21; providing Kilgore with verbal corrections, *id.* 41:3–4; and frequently explaining and re-explaining tasks that Kilgore never quite performed as expected, *id.* 61:3–17, 74:1–17 ("[I]t was the same thing, same few things that she just couldn't catch on to."). She also described Kilgore as lacking computer confidence. *See, e.g.*, *id.* 73:20–74:14. Stockton acknowledged that she did not document any of her concerns with Kilgore's work, *id.* 41:18–20; did not discuss them with anyone present besides Kilgore, *id.* 42:10–12; was unsure if she ever issued a formal reprimand, *id.* 58:1–59:2 (after being asked if she was "unsure as to whether or not the discussions [Stockton] had with . . . Kilgore fall underneath the verbal warning in this policy," Stockton agreed it would be considered a verbal warning but that she never informed Kilgore because she "did not think of it at the time"); did not believe that Kilgore's errors were significant enough to warrant termination or formal, recorded discipline, *id.* 99:4–15; and never actually engaged in the Zoo's evaluation and feedback policy, *id.* 59:3–14. According to Stockton, this lack of procedure was not unique to Kilgore—she never engaged in these formal processes or recorded performance issues with temporary seasonal employees. When asked how the receptionists hired for the 2024 season were more qualified than Kilgore, Stockton pointed to their higher self-identified computer confidence, *id.* 66:10–14, 69:15–70:1, which Stockton never verified, *id.*

70:2–12 (saying she asked the 2024 receptionists "what [computer programs] they were familiar with and confident using" without giving them any type of test).

Kilgore received her right to sue letter and brought this action against the Zoo alleging eight counts of discrimination: failure to accommodate under the Americans with Disabilities Act ("ADA") and Illinois Human Rights Act ("IHRA") (Counts III & IV); disparate treatment under the ADA and IHRA (Counts I & II);[2] retaliation under the ADA and IHRA (Counts VII & VIII); and hostile work environment under the ADA and IHRA (Counts V & VI).[3] Second Am. Compl. 5–12, ECF No. 23. The Zoo moves for summary judgment on all counts.

## DISCUSSION

### I.　　Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a factfinder to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most

---

[2] Kilgore characterizes her disparate treatment claims as disability discrimination, Second Am. Compl. 5–6, ECF No. 23. "Disability discrimination" under the ADA includes failure to accommodate, which she clearly alleges in Counts I and II, and disparate treatment. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). ADA disparate treatment claims require a plaintiff to prove that (1) she was disabled; (2) she was qualified to perform essential functions with or without accommodation; and (3) disability was the but for cause of the adverse employment action, *id.*, and Kilgore's filings articulate the same elements, *see* Second Am. Compl. 5–6; Resp. 9, ECF No. 28. Accordingly, the Court construes Kilgore's claims as disparate treatment.

[3] Kilgore also characterizes her hostile work environment claims as disability-based harassment. Second Am. Compl. 9–10, ECF No. 23. But hostile work environment claims seek to remedy harassment in the workplace, *see, e.g.*, *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019) (discussing discriminatory harassment as a factor in a hostile work environment claim), and the parties refer to her claims as hostile work environment claims in the filings, *see* Mot. Summ. J. 21–22; Resp. 14–16, ECF No. 28. As such, the Court treats Kilgore's claims as hostile work environment.

favorable to the non-moving party, and draw[] all reasonable inferences in that party's favor."
*McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S.
at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party
opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859,
861 (7th Cir. 1999) (quotation marks omitted). The moving party is "entitled to a judgment as a
matter of law" when the nonmovant has failed to put forth sufficient evidence to satisfy the
essential elements of her case as to which she has the burden of proof. *Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (quotation marks omitted). In other words, if the nonmovant fails to make a
showing of fact sufficient to establish an essential element of her case, summary judgment will
be issued against her. *Id.* at 322–23.

## II.     Analysis[4]

The ADA prohibits discrimination against "a qualified individual on the basis of
disability in regard to job application procedures, the hiring, advancement, or discharge of
employees, employee compensation, job training, and other terms, conditions, and privileges of
employment." 42 U.S.C. § 12112(a). This is commonly termed a disparate treatment claim. An
employer must also make "reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a disability who is an applicant or employee,
unless such covered entity can demonstrate that the accommodation would impose an undue
hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). The
ADA also prohibits employers from retaliating against an individual for opposing an act or
practice made unlawful by the ADA. *Id.* § 12203(a). Protection from a hostile work

---

[4] Throughout its analysis, the Court also cites to cases involving other antidiscrimination laws, such as Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e-17, because the statutes are similar. *See Miranda v. Wis.
Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) ("[I]n analyzing claims under the ADA, it is appropriate to
borrow from our approach to the respective analog under Title VII.").

environment is also cognizable under the ADA, providing a cause of action against a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). "Because Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework, [the court will] focus on the federal ADA claims." *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022).

### a. Failure to Accommodate

Kilgore brings failure to accommodate claims under the ADA and IHRA alleging that the Zoo did not properly accommodate her disability. Compl. 7–9. The ADA provides that covered employers may not discriminate against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). "Discrimination" includes the failure "to mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* § 12112(b)(5)(A). To prevail on a failure to accommodate claim, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). The Zoo does not dispute that Kilgore can establish both that she is a qualified individual with a disability and that the Zoo was aware of that disability. Zoo Mot. Summ. J. 19 n.4. Instead, the Zoo argues it is entitled to summary judgment on Kilgore's failure to accommodate claims because "(1) the Zoo provided reasonable accommodation and (2) Plaintiff failed to uphold her end of the interactive process by notifying the Zoo if accommodations offered were not acceptable." *Id.* at 18–21. Kilgore in turn argues that the Zoo is not entitled to summary judgment because a

7

reasonable jury could find that it failed to provide Kilgore with a reasonable accommodation and violated its duty to engage in the interactive process.  Resp. 12–14, ECF No. 28.

To determine a reasonable accommodation, an employer and employee should "engage in an interactive process." *Sears*, 417 F.3d at 797 (quotation marks omitted).  "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Id.* Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, . . . acquisition or modification of equipment or devices, appropriate adjustment or modifications of . . . policies, . . . and other similar accommodations."  42 U.S.C. § 12111(9).  "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000).  Nevertheless, "the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations." *Sears*, 417 F.3d at 802.  An employer has satisfied its duty of reasonable accommodation when "the employer does what is necessary to enable the disabled worker to work in reasonable comfort," *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995), and "[a]n ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (emphasis omitted).  Employers "must be willing to consider making changes in . . . ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande*, 44 F.3d at 542.

The Zoo asserts that Stockton's offering of "(1) bringing a regular height chair into the breakroom; [and] (2) eating at an employee's desk near the breakroom" constituted reasonable accommodation and that Kilgore "cannot meet her burden of providing evidence that the Zoo's accommodation was unreasonable." Mot. Summ. J. 19. Kilgore argues that "an arrangement that forces [a mobility-impaired employee] into a coworker's desk space subject to disruption and early termination of her lunch break, while denying her access to a safely usable bench and never offering an admittedly accessible classroom, does not constitute an effective or comparable accommodation." Resp. 14. A reasonable jury could find that the offers to bring a regular height chair into the breakroom or eat at another employee's desk failed to accommodate Kilgore, and that a genuine dispute of material fact remains as to whether the conservation classroom was offered as an option.

A jury could reasonably find that providing Kilgore with a chair significantly lower than the table was not a reasonable accommodation. Kilgore testified that without a table roughly at or below waist level, Kilgore Dep. 60:24–61:14, "it would be difficult" to manage the height difference between the regular chair and high table, *id.* 53:2–13. She would need an alternative place to set her food—food would fall off her lap due to her disability.[5] *Id.* As such, a reasonable jury could find that the regular height chair with the tall table would not resolve the underlying issue of providing Kilgore with a space in which she could eat her lunch.

Additionally, a jury could reasonably conclude that the use of another employee's desk only when the employee, who was typically scheduled to work the entirety of Kilgore's lunch break, was not present, was not a reasonable accommodation. *E.E.O.C. v. Sears, Roebuck & Co.*

---

[5] Although the bench Kilgore originally sat at did not have a table, she was able to place her lunch on the empty portion of the bench next to her. Kilgore Dep. 52:17–53:1. This option was not available when sitting in a regular height chair at a tall table.

is instructive.  In that case, when a plaintiff struggled to walk long distances but was otherwise able to perform her job duties, her employer allowed her to eat lunch in a stockroom and temporarily use a shortcut.  *Sears*, 417 F.3d at 803.  The *Sears* court determined these were not reasonable accommodations when viewed in the light most favorable to the plaintiff—"a jury could conclude that these did not make the facility accessible to [the plaintiff] because the accommodations were either rescinded or [she] faced reprimand when she tried to use them."  *Id.* Similar to *Sears*, the offer of Williams's desk was not a stable or consistent alternative. Although she did not face reprimand for using an offered alternative, Kilgore could not use Williams's desk if Williams was present, and Williams was typically scheduled to be present for the entirety of Kilgore's usual lunch break.  As a direct result of their disability-based mobility limitations, neither Kilgore nor the plaintiff in *Sears* had a reliable place to eat lunch.

A reasonable jury could conclude that use of Williams's desk for lunch was not a reasonable accommodation.  If Williams's shift generally began at 12:00 p.m., Kilgore's lunch regularly began at 12:00 p.m., and Kilgore was told that she could not eat at Williams's desk while Williams was present, the Court does not see how this constitutes a reasonable, equivalent accommodation as a matter of law.  A jury could reasonably conclude that relying on one employee's late arrival to ensure the accommodation of a disabled employee is not a reasonable solution.  As such, ascertaining the exact number of times that Kilgore's lunch break was cut short by Williams's arrival is a somewhat moot point—either way, Williams's shift began at 12:00 and Kilgore's break began at 12:00, rendering Williams's desk a possibly unreasonable alternative.  Nevertheless, the Zoo provides its own analysis of the data provided by Williams and Kilgore's timesheets.  Mot. Summ. J. 7 (compiling information on Kilgore's sixty-five lunch breaks and comparing it to Williams's shifts).  To the extent this is an effort to highlight that

10

Kilgore's lunch was interrupted just a few times, the data at best presents a genuine dispute of material fact.

Based on the Court's review of Williams's and Kilgore's timesheets, there were at least fourteen instances in which Williams was clocked in while Kilgore was clocked out on her lunch break.

| Date | Kilgore Began Lunch | Kilgore Returned from Lunch | Williams Clocked in | Duration of Kilgore's Break |
|---|---|---|---|---|
| April 21, 2023 | 12:31 | 1:01 | 12:20 | 30 minutes |
| April 28, 2023 | 12:02 | 12:32 | 12:20 | 30 minutes |
| May 3, 2023 | 12:08 | 12:38 | 12:31 | 30 minutes |
| May 10, 2023 | 12:05 | 12:35 | 12:09 | 30 minutes |
| May 17, 2023 | 12:05 | 12:38 | 12:37 | 33 minutes |
| May 19, 2023 | 12:03 | 12:38 | 12:24 | 35 minutes |
| May 24, 2023 | 12:00 | 12:30 | 12:17 | 30 minutes |
| May 26, 2023 | 12:02 | 12:34 | 12:28 | 32 minutes |
| June 14, 2023 | 12:43 | 1:13 | 12:37 | 30 minutes |
| July 19, 2023 | 12:32 | 12:54 | 12:38 | 22 minutes |
| July 31, 2023 | 12:05 | 12:36 | 12:24 | 31 minutes |
| September 27, 2023 | 12:20 | 12:54 | 12:43 | 34 minutes |
| October 13, 2023 | 12:15 | 12:43 | 12:29 | 28 minutes |
| October 18, 2023 | 12:13 | 12:43 | 12:42 | 30 minutes |

*Compare* Kilgore Timesheets, Mot. Summ. J. Ex. 18, ECF No. 27-18, *with* Williams Timesheets, Mot. Summ. J. Ex. 19, ECF No. 27-19.

Kilgore also testified that she frequently returned to work early but waited until thirty minutes elapsed to clock in. Kilgore Dep. 86:23–87:16. The Court does not see anything in the record contradicting this testimony; therefore, a jury could reasonably find that the logged duration of her lunch break, be it thirty minutes or twenty-one, is not a true reflection of how long Kilgore was on break. In this case, it is helpful to also consider the instances in which Williams clocked in shortly after Kilgore ended her lunch break. A review of the timesheets reveals another six instances in which Williams clocked in within ten minutes of Kilgore returning to work.

11

| Date | Kilgore Began Lunch | Kilgore Returned from Lunch | Williams Clocked in | Duration of Kilgore's Break |
|---|---|---|---|---|
| April 26, 2023 | 12:13 | 12:34 | 12:37 | 21 minutes |
| June 2, 2023 | 12:04 | 12:36 | 12:36 | 32 minutes |
| July 3, 2023 | 12:16 | 12:44 | 12:45 | 28 minutes |
| July 12, 2023 | 12:04 | 12:30 | 12:39 | 26 minutes |
| August 14, 2023 | 12:07 | 12:40 | 12:41 | 33 minutes |
| September 13, 2023 | 12:12 | 12:45 | 12:46 | 33 minutes |

*Compare* Kilgore Timesheets, *with* Williams Timesheets.

This totals as many as twenty instances in which Kilgore's lunch break overlapped with Williams's arrival. It is difficult to discern the actual percentage of Kilgore's lunch breaks and Williams's work shifts that overlap because there is no indication of when Kilgore was offered Williams's desk as an alternative. *See, e.g.*, Kilgore Dep. 84:19–22. As such, the Court does not find the Zoo's calculations, Mot. Summ. J. 7, to be particularly conclusive given the lack of clarity as to how many times this *could* have happened. The Zoo points out that, on days in which both Kilgore and Williams worked, Kilgore's lunch breaks were shortened only four times. Mot. Summ. J. 7. The Court's review of the record likewise reveals four shortened lunch breaks where Williams was either clocked in during Kilgore's break or clocked in within minutes of Kilgore returning from her lunch (April 26, 2023; July 3, 2023; July 19, 2023; October 13, 2023) and one shortened lunch break where Williams clocked in nine minutes after Kilgore returned to work (July 12, 2023). But the Court again notes that, according to Kilgore, the mere fact that she was clocked out for thirty minutes does not necessarily mean she was on break the entire allotted time.

Because a reasonable jury could find that the shorter chair and Williams's desk were not reasonable accommodations, whether the Zoo fulfilled its duty to reasonably accommodate Kilgore hinges on whether the conservation classroom was offered as an option. No one disputes that the classroom would have been a reasonable accommodation, but Kilgore testified she was

12

never given the option, Kilgore Dep. 82:16–83:2, while Stockton testified she offered it and Kilgore seemed disgusted, Stockton Dep. 21:12–23:3. This establishes a genuine dispute of material fact for the jury to decide.

In any case, the Zoo argues that it is entitled to summary judgment because Kilgore "failed to uphold her end of the interactive process by notifying the Zoo if accommodations offered were not acceptable." Mot. Summ. J. 19; *see also* Reply 5–6, ECF No. 29. Kilgore argues that the Zoo "prematurely closed the interactive process, failed to offer [her] a comparable and accessible break location despite knowing of her mobility impairment, and impermissibly shifted the burden onto her to endure an inadequate arrangement rather than continuing to work collaboratively to identify a reasonable accommodation." Resp. 14. Because the determination of who was responsible for a breakdown in the interactive process, if anyone, requires resolution of whether the Zoo offered the conservation classroom to Kilgore, the Zoo's argument must fail.

"If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable." *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821 (7th Cir. 2017). "Because the interactive process is not an end in itself," an employee "must show that the result of the inadequate interactive was the failure of [the employer] to fulfill its role in determining what specific actions must be taken . . . to provide the qualified individual a reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000) (quotation marks omitted). The process is triggered when an employee "notif[ies] her employer of her disability." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014).

13

The Zoo asserts that "this is a textbook case of an employee not providing the employer with sufficient information to determine the necessary accommodation," analogizing Kilgore's claims to that of the plaintiff in *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926 (7th Cir. 2019). Mot. Summ. J. 21. This is not convincing. The *Graham* plaintiff, after a work injury, had several medical restrictions, including that he needed to work sitting down. *Graham*, 930 F.3d at 928. His employer assigned him to skate sharpening, which it asserts could be performed while seated. *Id.* Even though the plaintiff argued that he could only complete skate sharpening while standing and thus that his employer did not comply with his medical restrictions, the Court found that the plaintiff was responsible for the breakdown in the interactive process because he failed to inform his employer that the offered accommodation, which the employer thought complied with his medical restrictions, was inadequate. *Id.* at 928–29. While the *Graham* employer did not know that the plaintiff needed to stand for skate sharpening, the Zoo knew that Kilgore could not sit in the taller chair, needed somewhere to eat her lunch, and that Williams's shift began at the same time as Kilgore's lunch began. In other words, where the *Graham* employer lacked requisite information to realize that the offered accommodation did not actually meet the plaintiff's needs, the Zoo had all the requisite information to understand that Williams's desk may not have accommodated Kilgore. That Kilgore never communicated the inadequacy of Williams's desk as an alternative does not mean she was responsible for a breakdown of the interactive process; the interactive process does not require Kilgore, as an employee who put her employer on notice of her need for an accommodation, to inform the Zoo that an accommodation, which a reasonable jury could deem obviously inadequate, was not working. *Cf. Sears*, 417 F.3d at 808 ("A reasonable jury could find that [the employer's] *only* communication to [the plaintiff] . . . was the suggestion that she use [an alternative] which [her

supervisor] knew would do nothing to facilitate [her] access to her work area. This is not meaningful participation in the interactive process.").

Furthermore, a reasonable jury viewing the undisputed facts could find that the Zoo did not adequately engage in the interactive process with Kilgore. When an employee has a "blanket nature" restriction, there is a greater burden placed on her to communicate and clarify the nuances of what could reasonably accommodate her. *Brown*, 855 F.3d at 824 ("Given the blanket nature of [the plaintiff's] restriction, the obligation fell to the plaintiff to update and further clarify the kinds of work she could do." (quotation marks omitted)). Consideration of *Brown* and *Steffes v. Stepan Company*, 144 F.3d 1070 (7th Cir. 1998), Seventh Circuit cases in which the plaintiff was deemed responsible for the breakdown in the interactive process, is instructive. Unlike the plaintiffs in *Brown* and *Steffes*, Kilgore did not have blanket restrictions impacting her job duties. Where the *Brown* plaintiff was a school employee who could not be around rowdy students, *Brown*, 855 F.3d at 824–25, and the *Steffes* plaintiff worked for a chemical company but could not breath chemicals, *Steffes*, 144 F.3d at 1071–72, Kilgore merely requested a place in which she could comfortably eat her lunch. Additionally, like the employer in *Spurling*, neither Stockton nor the Zoo asked Kilgore any questions or followed up with her about the accommodations offered, nor did they engage with any of the Zoo's policies regarding ADA accommodations. *Cf. Spurling*, 739 F.3d at 1061–62 (finding the employer liable for a breakdown in the interactive process because, although the employer followed the appropriate procedure for reviewing and providing accommodations initially, the employer ultimately "failed to carry it through"). As such, the Zoo has not established as a matter of law that Kilgore was responsible for the breakdown of the interactive process.

15

Also integral to the interactive process analysis is whether Stockton offered the conservation classroom to Kilgore as an option.  This is relevant to determining what steps the Zoo took to accommodate Kilgore's disability and how thoroughly it considered and presented accommodation options.  If the conservation classroom was provided to Kilgore, then her failure to accommodate claims must fail because she was offered a reasonable accommodation.  Alternatively, if the conservation classroom was not offered to Kilgore, a reasonable jury could conclude that she was not reasonably accommodated, and must then decide whether there was a breakdown in the interactive process and, if so, which party bears responsibility.  Because this question cannot be resolved without first determining whether the conservation classroom was offered to Kilgore, a genuine dispute of material fact remains as to the interactive process prong of Kilgore's failure to accommodate claim.  For these reasons, the Zoo's motion for summary judgment as to Kilgore's failure to accommodate claims under the ADA and IHRA is denied.

### b.  Disparate Treatment

Kilgore brings disparate treatment claims under the ADA and IHRA alleging that the Zoo declined to rehire her for the 2024 season due to her disability.  Compl. 5–7.  To prevail on an ADA disparate treatment claim, a plaintiff must show that "(1) [the] plaintiff was disabled; (2) [the] plaintiff was qualified to perform the essential functions with or without reasonable accommodation; and (3) [the] disability was the 'but for' cause of adverse employment action." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).  Direct evidence of disability discrimination is rare.  *Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018).  Instead, plaintiffs typically demonstrate discrimination with circumstantial evidence.[6]  *Id.*

---

[6] Although the Seventh Circuit previously distinguished "direct" from "indirect" evidence, *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), it has subsequently abandoned this practice, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016).  While the evidence in an employment discrimination case is rarely straightforward, the Seventh Circuit has found that attempting to funnel the often factually complex cases into

This may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quotation marks omitted). "[A] subjective belief of discrimination[,] no matter how genuine, cannot be the sole basis for a finding of discrimination." *Kizer v. Child.'s Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) (first alteration in original) (quotation marks omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Disparate treatment claims can be evaluated under either the *McDonnell Douglas* burden-shifting framework or the *Ortiz* holistic review framework,[7] *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); however, "when the issue of satisfactory job performance lies at the heart of the dispute and must be analyzed in detail at multiple stages of the *McDonnell Douglas* test, it is often simpler to run through that analysis only once," *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573–74 (7th Cir. 2021) (quotation marks and alteration omitted). There is no question that Kilgore, as someone dealing with paralysis on one side of her body, has protected characteristics. Kilgore Dep. 8:10–21; *Vande Zande v. Wis. Dept. of Admin.*, 851 F.

---

categories has a greater potential for creating confusion rather than simplifying the analysis. *Id.* at 765. This is not to say that courts should completely abandon any acknowledgement of the difference between the types of evidence, but they should no longer separate evidence into categories when evaluating it. *See Rowlands*, 901 F.3d at 801–02.

[7] "In discrimination cases, when a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025) (alteration and quotation marks omitted). The *McDonnell Douglas* burden-shifting framework is one way in which a plaintiff may establish her claim. *Id.* Alternatively, the holistic review of *Ortiz* means "that a plaintiff does not have to satisfy the *McDonnell Douglas* framework to succeed." *Id.* In short, both *McDonnell Douglas* and *Ortiz* are "merely convenient ways to organize our thoughts." *Id.* (quotation marks omitted).

17

Supp. 353, 360 (W.D. Wis. 1994) ("[P]aralysis is clearly a disability under the ADA."), *aff'd*, 44 F.3d 538 (7th Cir. 1995). She was not rehired, which is indisputably an adverse employment action. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007). The Zoo argues that Kilgore cannot succeed under either the *McDonnell Douglas* burden-shifting framework or the *Ortiz* holistic review. Mot. Summ. J. 11. But because "the heart of this dispute" is "whether [Kilgore] performed poorly and whether that poor performance caused her termination," the Court will "run through that analysis only once" under the *Ortiz* holistic review. *Khungar*, 985 F.3d at 574 (citing cases); *see also Bommiasamy v. Galesburg Hosp. Corp.*, 727 F. Supp. 3d 767, 791 (C.D. Ill. 2024) ("The *McDonnell Douglas* framework is not as useful where, as here, the defendant relies upon performance problems as the legitimate, non-discriminatory reasons for the plaintiff's termination. The Court proceeds straight to the *Ortiz* inquiry and considers whether there is sufficient evidence from which a jury could conclude that [the plaintiff] was illegally terminated because of his [protected characteristic]." (citation omitted)). Kilgore argues that there is sufficient evidence that the Zoo gave pretextual reasons for not rehiring her. *See, e.g.*, Resp. 10.

Kilgore must show that there is sufficient evidence to allow a reasonable jury to conclude that the Zoo's cited legitimate, non-discriminatory reasons for not rehiring her "are pretextual, meaning false, allowing an inference that the [Zoo's] true intent was discriminatory." *Runkel v. City of Springfield*, 51 F.4th 736, 744 (7th Cir. 2022); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that a showing of pretext "may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . ."). "[A]n employer's dishonest explanation of a decision can, by itself,

18

support an inference that its real reason was unlawful." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 695 (7th Cir. 2023) (quotation marks omitted).

The Zoo avers that the legitimate, non-discriminatory reason for not rehiring Kilgore was that she lacked "confiden[ce] in the position" and "computer skills," including "getting around in [the] computer system" and making phone calls. Stockton Dep. 73:20–74:14. As a result, Stockton "was continuously having to help her." *Id.* 74:1–4. Kilgore argues that the Zoo's reasons are pretextual because the Zoo's "handling of [her] alleged performance issues and the 2024 hiring decision reflects exactly the kind of inconsistency and procedural deviation the Seventh Circuit recognizes as probative of pretext." Resp. 10. Because Stockton did not keep any written record of her comments or concerns with Kilgore's performance and never engaged in a formal disciplinary process, Stockton's testimony is the only evidence provided that Kilgore's work was unsatisfactory. Stockton Dep. 38:23–41:20 (testifying to correcting typos and miswritten phone numbers with Kilgore without documenting the conversations or mistakes). And Kilgore's testimony directly contradicts Stockton's—according to Kilgore, she never received any unsatisfactory comments and Stockton told her she did "awesome" at the end of the season. Kilgore Dep. 111:4–13, 115:24–116:13 (testifying that she never received any negative feedback and Stockton never spoke with her about typos or work corrections).

The Zoo argues that many of Kilgore's arguments turn on her evaluation of her own performance. *See, e.g.*, Mot. Summ. J. 18 (arguing that "[h]ow Kilgore perceived her performance . . . is not sufficient to defeat summary judgment"). In some circumstances, a plaintiff's assertion that her job performance was satisfactory can show that the plaintiff was meeting her employer's legitimate expectations. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1171–72 (7th Cir. 1997). However, an employee's "own evaluation of [her] work cannot be

19

imputed to [the employer], and is insufficient to permit [her] case to survive past summary judgment." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir. 2004) ("An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance."). When deciding whether an employee met employer's expectations, courts must look at the employee's "job performance through the eyes of her supervisors at the time.  The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reason is *honest*."  *Khungar*, 985 F.3d at 574 (alteration and emphasis in original) (quotation marks omitted).

The core disagreement here is a factual one about how *Stockton* evaluated Kilgore's work—Stockton says Kilgore had repeated errors requiring frequent verbal corrections and Kilgore says she never received any verbal corrections at all.  This is different than a plaintiff asserting he fulfilled work expectations despite at least a year's worth of mediocre to poor performance evaluations, *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865–66 (7th Cir. 1996); a doctor-plaintiff asserting she was meeting her employer's expectations despite documented complaints from patients, staff, and a "final warning" about violating policies, *Khungar*, 985 F.3d at 574–75; a plaintiff arguing she met her employer's expectations while aware that supervisors "were dissatisfied with her performance," *Wyninger*, 361 F.3d at 980; or a plaintiff asserting his performance was "at least good" in an affidavit in an attempt to overcome performance evaluations rating his overall work as "[u]nsatisfactory," *Dickerson*, 657 F.3d at 602–03.  In this case, unlike the others, a genuine dispute of material fact exists as to whether Kilgore's performance was truly unsatisfactory such that a reasonable jury could credit Kilgore's

20

testimony that she never received verbal corrections over Stockton's testimony that she consistently had to manage Kilgore's work.

The Zoo raises a few other arguments, *see* Mot. Summ. J. 14–15; however, because "an employer's dishonest explanation of a decision can, by itself, support an inference that its real reason was unlawful," *Vichio*, 88 F.4th at 695 (quotation marks omitted), and Kilgore has established a dispute of material fact as to the honesty of the Zoo's explanation for its decision, her claims for disparate treatment must survive summary judgment.

### c. Retaliation

Kilgore brings retaliation claims under the ADA and IHRA alleging that the Zoo declined to rehire her for the 2024 season in retaliation for her accommodation request. Compl. 10–12. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [it]." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation, a "plaintiff must prove that [she] engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). At summary judgment, "the plaintiff[] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (affirming a grant of summary judgment in favor of the employer where "the plaintiffs' argument for retaliatory animus relies entirely on speculation"). A plaintiff can prove causation through either the burden-shifting framework set forth in *McDonnell Douglas* or through an evaluation of the evidence as a whole. *See Dickerson*, 657 F.3d at 601.

21

The Zoo argues that, under either framework, Kilgore's retaliation claims fail because of a lack of evidence. Mot. Summ. J. 15–18. Kilgore responds that she has provided sufficient evidence that a reasonable jury could find that the Zoo's decision not to rehire her was retaliation. Resp. 11–12. As the Zoo argues, Kilgore's retaliation claims cannot succeed under the *McDonnell Douglas* burden-shifting framework because she has not provided any evidence of similarly-situated comparators. Mot. Summ. J. 16–17; *see Dickerson*, 657 F.3d at 601–02 (outlining that a *prima facie* case of retaliation requires a plaintiff to demonstrate that she "(1) engaged in protected activity; (2) was performing [her] job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer"). Nevertheless, her retaliation claims survive under the *Ortiz* holistic review. As such, the Court focuses its analysis on Kilgore's retaliation claims under *Ortiz*.

Under the *Ortiz* framework of holistic review, the Court must consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation. *Rowlands*, 901 F.3d at 801. "[T]he mere fact that [a plaintiff] requested accommodations and was subsequently terminated is not sufficient in itself to show causation." *Adzogble v. Tyson Fresh Meats, Inc.*, 677 F. Supp. 3d 770, 789 (C.D. Ill. 2023). As with disparate treatment, plaintiffs often present circumstantial evidence of discrimination. *Monroe*, 871 F.3d at 504. Kilgore bases her argument on temporal proximity, "when viewed alongside the undisputed absence of any documented performance deficiencies, the lack of written evaluations or discipline, and the evidence that [Kilgore] had successfully performed the receptionist role and received positive feedback." Resp. 12. Contrary to Kilgore's characterization, the temporal proximity in this case is not strong—Kilgore engaged in protected activity during her employment, which ended in

October, and was not informed of the Zoo's decision not to hire her for the 2024 season until the following February, a few weeks after the 2024 season application reopened. *See* Jan. 18, 2024 Email, Mot. Summ. J. Ex. 10, ECF No. 27-10 (informing several people, including Kilgore, that the 2024 applications were open); *see also* Feb. 8, 2024 Email, Mot. Summ. J. Ex. 20, ECF No. 27-20 (informing Kilgore that she was not selected for the 2024 season). Additionally, there is no evidence of ambiguous statements or behavior towards other disabled employees. In fact, Kilgore herself mentioned another disabled temporary seasonal employee who was consistently rehired despite frequent mistakes. Kilgore Dep. 120:14–22. Kilgore presents no evidence of similarly situated employees outside of the protected group who received better treatment. *See generally* Resp.

Nevertheless, Kilgore has established a genuine dispute of material fact as to whether the Zoo's asserted reasons for not re-hiring her for 2024 was pretextual. *See supra* Section II(b). As this is sufficient to survive summary judgment, *cf. Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020) (entering summary judgment in favor of the defendant-employer "because there is no material issue of fact as to whether its reason for not hiring [the plaintiff] is pretext for retaliation"), the Zoo's motion for summary judgment as to Kilgore's retaliation claims is denied.

### d. Hostile Work Environment

Kilgore brings hostile work environment claims under the ADA and IHRA against the Zoo. Compl. 9–10. A work environment is hostile when it "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations omitted). Hostile work environment claims are "composed of a series of

23

separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). Plaintiffs bringing a hostile work environment claim must show: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on [their disability]; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023); *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 856 (7th Cir. 2019).

Kilgore's hostile work environment claims cannot survive summary judgment. She has not identified a genuine dispute of material fact as to the severity or pervasiveness of any harassment and, based on the evidence in the record, no reasonable jury could find that the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment. To determine whether conduct is severe or pervasive, courts "consider the totality of the circumstances." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). This includes consideration of "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Id.*

First, the discriminatory conduct—not providing Kilgore with an appropriate space to eat her lunch—occurred every shift she worked after informing Stockton that she could not eat at the breakroom table. Regardless of whether Kilgore's lunch was actually interrupted by Williams's arrival on any given day, Kilgore's daily experience was one of eating lunch in isolation and frequent interruption. *Cf. Hall v. City of Chicago*, 713 F.3d 325, 334 (7th Cir. 2013) (finding

24

that isolation of a female employee in combination with occasional outbursts was sufficient to establish a hostile work environment claim).  Second, a reasonable person would find the lack of a dependable location to eat lunch challenging and disappointing, but they would not find Kilgore's lunch situation to be so offensive as to constitute a hostile work environment.  Third, Kilgore did not find eating at Williams's desk humiliating, Kilgore Dep. 84:2–5; however, she did find it humiliating to be at the desk when Williams arrived, *id.* 92:3–6, and felt "very humiliated" to learn that Jackson thought it was not appropriate for her to eat at the bench, *id.* 69:13–22.  Fourth, Kilgore has presented no evidence at all indicating that her lack of a consistent place to eat lunch unreasonably interfered with her performance at work—she discussed the ways in which it took an emotional toll on her and unpredictably impacted her lunch break, but ultimately presented nothing suggesting any sort of negative impact on her performance.  *See generally*, Kilgore Dep.  And fifth, the conduct was directed at Kilgore.

Although some of these factors weigh slightly in Kilgore's favor, when considering the totality of the circumstances, she cannot establish that the conduct was sufficiently severe or pervasive as to interfere with her work performance.  Her lunch experience was isolating, but it did not rise to the level of that in *Hall*, in which the plaintiff's supervisor "assign[ed] her unnecessary menial work and prevent[ed] others from interacting with her," as well as "sporadically intimidating and directing anger at her."  *Hall*, 713 F.3d at 331.  Despite Kilgore's humiliation when learning of Jackson's feelings and when Williams arrived to her desk while Kilgore was on her lunch break, the absence of abuse or threats, as well as the lack of humiliation for eating at Williams's desk generally, weakens Kilgore's claim.  When comparing these with the fact that no reasonable person would find her lack of a place to eat lunch to constitute a hostile work environment and that she has provided no indication that it

25

unreasonably interfered with her work performance, a reasonable jury could not find that the harassment was sufficiently severe or pervasive as to alter the conditions of her employment. *See, e.g.*, *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (finding the claim was not sufficiently severe or pervasive because "[t]hough [superior's] conduct was pervasive, it was not physically threatening, nor did it interfere with [the plaintiff's] work performance."); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("[The court] will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating."). For these reasons, the Zoo's motion for summary judgment on Kilgore's hostile work environment claims is granted.

## CONCLUSION

Defendant Rock Island County Forest Preserve, doing business as Niabi Zoo's, motion for summary judgment, ECF No. 27, is GRANTED IN PART and DENIED IN PART. Plaintiff Katy Kilgore's claims for hostile work environment under the ADA and IHRA are dismissed; her claims for failure to accommodate, disparate treatment, and retaliation under the ADA and IHRA survive. The proposed pretrial order is due on September 30, 2026, the final pretrial conference is set for 1:30 p.m. on October 7, 2026, and the trial is set for 9:00 a.m. on November 30, 2026. The final pretrial conference and the trial will both take place in Courtroom A in the Rock Island Federal Courthouse at 1701 4th Ave. Rock Island, Illinois 61201.

Entered this 22nd day of April, 2026.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE
